And the third of the four that we have is the United States of America, XRL-Greenfield v. Medco Health Solutions Inc, et al., number 17-1152, Ms. Proserena and Ms. Allen and Mr. Singer. Good morning, Your Honors, and may it please the Court. Regina Proserena on behalf of the appellant, Stephen Greenfield. At this time, I'd like to reserve two minutes for the rebuttal argument. Sure. The evidence in this case showed that a credo knowingly paid kickbacks in exchange for recommendations to the Hemophilia Association of New Jersey's New Jersey patient base. And what was the actual evidence of kickbacks with regard to any of these 24 federal claims? The evidence of kickbacks, Your Honor, is there's no direct evidence. We have no direct evidence of the intent of the specific patients, but we don't need direct evidence that these 24 specific patients actually received kickbacks. We need evidence that a credo paid the kickbacks, the recommendations were made, and as a result of those recommendations to the entire New Jersey hemophilia population, a credo obtained business for which they submitted 24 Medicaid submissions. There were charitable contributions given by a credo to one entity. That entity then gave the money to other entities that run hemophilia treatment centers, correct? Yes, Your Honor. And so what evidence was there that it gave these charitable contributions for the purpose of violating the anti-kickback statute? Your Honor, there is evidence that we presented that a credo's employees, its high-level corporate employees, knew that it was giving payments to Hanjay in exchange for getting business from New Jersey hemophiliacs. We have the president of a credo, Craig Mears, telling our client that he had a deal with Hanjay. We give them money, they give us patients. We have Vice President Karen Griffin who testified in her depositions that she met with the director of Hanjay and the deal was very clear and it was a deal that had been ongoing for years. The district court here proceeded on the assumption that there was an AKS violation, right? Yes, Your Honor. And so when we're looking at the question of the claim here and whether there's a false claim act violation, that claim, according to the 2010 amendments, needs to include items or services resulting from a violation of, in this case, the anti-kickback statute. Yes, Your Honor, it does. So that says to patients 1 to 24, right? No, Your Honor, it doesn't necessarily say that because there's nothing in the kickback statute or the false claim act that requires us to show the intent of those 24 patients. Let's assume that patient number 23 resides next to a credo specialty pharmacy. And so that is the most convenient pharmacy for them to go to get factor. Assume they are not a member of Hanjay and assume they never received communications from Hanjay and didn't go to the Hanjay website. Is it your position that a submission by a credo of a claim from that patient would constitute, assuming an AKS violation based on the conduct that you've described, that a claim submitted for that patient would constitute a false claims act? Your Honor, I would submit to you that the likelihood of your scenario being in existence in New Jersey We'll talk about that in a moment, but assume that hypothetical. The patient is going to a credo because it's next door, not an Hanjay member, not exposed to the preferred provider list. Is the submission of a claim from a credo, is it your position that that constitutes a false claims act violation? Yes, it is, Your Honor. And how could that be? Because the evidence has shown, first of all, statistically, that hemophilia is a very rare condition. And that most hemophiliacs, it's a genetic condition, so people get this, unfortunately, from their parents. And so the hemophiliacs in New Jersey are families of hemophiliacs. They're brothers. It's also a meal disorder for the most part. The 99% and the 95% of meals. So that they're brothers, they're families, they're cousins all have this disorder. Come back.  And so far, is that a violation of the anti-take-back statute? If a provider is giving money to, I'm sorry, if a company is giving money to a provider. Giving money to a doctor in hope of a referral. In the hope of a referral, Your Honor, that's a question of fact as to what the intent of the provider was. And this is a very fact-intensive analysis. But it's going to look at, did that provider give that money with the intent, with the knowing intent, to get a referral? So what is the evidence here that these, quote, charitable contributions, close quote, were given with the intent to get referrals? Your Honor, the evidence on that particular issue is not only direct, but it's circumstantial. Okay, what's the direct evidence? And then we'll get to the circumstantial. The strongest piece of direct evidence is the return on investment analysis. The return on investment analysis, ordered from the highest levels of a credo, was looking specifically at whether we continue to give or increase our giving to HandJ, and what kind of business it brings to a credo. What is the evidence in the record that that intent, any of those actions, relate in any way to any one of these 24 patients? The record evidence shows that that related to every patient of a credo. The 24 patients? What can you point us to in the record that demonstrates that any of these, that these 24 patients were members of HandJ, for example? What I can point you to in the record is Elena Bostic, the head of HandJ's own testimony, and I don't have the exact citation here with me, but every hemophiliac in New Jersey was a member of HandJ. That HandJ had 800 to 900 members, of which there were 400 to 500 member families. The return on investment analysis, a credo executive said there were 640 hemophiliacs in New Jersey. If a credo had 800 to 900 members and 640 hemophiliacs, then the inference is extremely strong that every hemophiliac in New Jersey belonged to HandJ. But members of HandJ include other family members, not the hemophiliac, him or herself necessarily, right? Yes, and we're looking here not at a motion to dismiss stage, but at summary judgment. Yes, sure. So I take your point as to the inferences that might be drawn from, you know, the likelihood because of percentages at the motion to dismiss stage. But at summary judgment, we're looking to, with the opportunity to develop some of these facts in discovery, what you have developed. So you have not, as I understand your answer, there is nothing from discovery that confirms that patients 1 through 24 are members of HandJ. Your Honor, I see my time is up. Can I answer that question? Go right ahead. We were very hampered in discovery. And so the judge required us to begin depositions before all of the documents had been provided to us. In fact, the names of those 24 patients were not provided to us until very late in the process, almost three or four months into discovery after many depositions had been taken. But Ms. Bostic, the head of HandJ, did tell us that the majority of patients, virtually every patient in New Jersey who was a hemophiliac was a member of HandJ. Second, there's a return on investment analysis where Acredo and its executives are saying, we are making this payment to HandJ to buy patients. We are buying our New Jersey business. And when they are buying that New Jersey business, they're buying all of the business, Medicare, Medicaid, private insurance, and others. I just have one question. Isn't this the same kind of argument that was rejected by the Third Circuit Court of Appeals in Quinn? No, Your Honor, it's not. And the reason it's different is that Quinn was not specifically looking at an anti-kickback violation. Quinn was looking at causation in a traditional False Claims Act case. Here, no court has ever set the causation standard as high as the district court did here, that there be a direct causal link. In every court that has looked at this issue, they talk about the tint. They talk about the stemming from the kickbacks. Are you saying there's no causation required? No, I'm not saying there's no causation requirement, but I am saying there's not a causal connection required. There's a connection required, but there's not a causation required, I think is what I should have said. Okay, so why still wouldn't Quinn apply? You can't extrapolate that. If you have general information, you can't say, well, it's clear that at least one of these 24, for example, in your case, had to have gone to this advance of a credo services as a result of the payment by a credo to HA&J. Your Honor, Quinn does not apply here because the anti-kickback statute, on its face, is directing that we're not asking the question of who made the submission or how the submission was made. Instead, we're looking at the intent when the kickback was given. In this particular case, a credo gave the kickback. So even if we went your way, we'd have to remand because the court here assumed, did it not, that there was an anti-kickback statute violation? The court assumed that. So it did not make any type of filing with respect to that? That is correct, Your Honor. All right. Let's hear from Ms. Allen to see if we can get some of this straightened out. Thank you, and may it please the Court. Gina, why don't you put 10 minutes on instead of five? Catherine Allen, on behalf of the United States. We're here for a limited purpose to make clear that a claim for medical care that was not provided in compliance with the anti-kickback statute is false under the False Claims Act. Let's go to your brief. Maybe you can help sort some of this out for me. You say on page 2, to establish that a kickback violation rendered a claim false under the False Claims Act, it is sufficient for a plaintiff to show that the claim seeks reimbursement for medical care that was the subject of the violation. So here we're assuming that, I guess the court assumed that there was an anti-kickback violation, but what happens when the court doesn't assume it? How do I go find an anti-kickback statute violation to begin with? Well, Your Honor, we do think that a lot of the conceptual difficulty with this case has come from the fact that the district court assumed the anti-kickback statute violation. And because the district court assumed that, we don't know what the scope of that violation was, what the basis of that violation was. And so, as you suggest, it's difficult to then determine whether the subject of that violation were the items and services that it created and billed the federal government for. Let's play it out, and then you can come back, and we'll give you a chance to fill in all the blanks. In page 8 and 9, you talk about the relator has to show a connection between the kickback paid by a credo and the claims the credo submitted for federal beneficiaries. What subject or connection are you talking about? What is a connection that suffices for you? Sure. So the question is whether the claim is false. And as this court recognized in Wilkins, when someone submits a claim to the federal government, they're either implicitly or explicitly certifying that the items or services for which they're seeking reimbursement complied with the anti-kickback statute. So the question here is whether the items or services that a credo billed the federal government for complied with the anti-kickback statute. And that in the government's view is as to that claim, or the transaction underlying that particular claim. That's correct. Each claim would need to be false. So it's not sufficient from the government's perspective with whatever the causal link or relationship is that there be a violation somewhere else in the company unrelated to the claim that's being filed that needs to be the subject of that claim or transaction underlying the claim as to that subject  Exactly, Your Honor. And if you look at the express certification in the provider agreement, it makes that clear. The provider is agreeing that the claim and the underlying transaction complied with the kickback statute. And so I think it's helpful just to look at what the kickback statute entails. And so the kickback statute criminalizes knowingly offering or paying remuneration to someone to induce them to refer patients for the furnishing of any item or service that may be paid by the federal government. So we're assuming that happened here. And we don't know if any of these 24 referrals were as a result of this. I'm trying not to get into causality, direct causality, but we don't know if any of them in any way were affected by Well, Your Honor, the question isn't whether the patients were actually affected by the referrals. The question is just whether the charities referred the patients that Acredo then submitted claims to the federal government for. And I think it's much easier to discuss this. You have to show that there was some type of a referral. Oh, that's correct, Your Honor. Here you have a charity that wasn't referring. And they're making an argument that it's only a recommendation. And there's not a referral. It's not like you have Dr. A and you give the money to Dr. A and then Dr. A gives referrals. It's like you gave the money to a friend of A and you don't know whether A got any of the money to induce the referral. So I guess that's really a problem here. Your Honor, I think your questions sort of express some skepticism and go to the question of whether there was a kickback statute violation here in the first place. And, again, we think that part of the problem, the conceptual difficulty with this case, is that because the district court assumed there was a kickback violation, without spelling out what the scope of that violation was, it's been difficult. Arguably, if there was a connection there, you would still have to show, at least to the patients that were being treated, that there was some type of a referral. So you would have to show some kind of a linkage, at a minimum, between the charity and the party that was actually sending the patients to a particular provider. That's correct, Your Honor. And I think it's easier to talk about this in the context of just a classic case. And that's really what we're here to talk about is not the facts of this case, but in a classic scenario where a service provider pays kickbacks to a doctor, the doctor then refers patients to that service provider. All of the claims that that service provider then submits to the federal government for the patients that were referred by the doctor, all of those claims are false. And it doesn't matter. Let's go back to the question. She's saying there's no referral here. Well, and that's a question of whether there's a violation under the kickback statute. And it's not something that we've taken a position on here or that I'm authorized to take a position on. And so, again, we think that... So let's assume it's a recommendation, not a referral. What do we do? In other words, we have certain... So if there's a... This outfit is one of four that we recommend that you consider. We don't know if any of these persons... What happens there? There's a recommendation that you can use from this pot of four, but we don't... Two responses. First, the kickback statute does criminalize recommendations for purchasing particular items or services. The question of whether what happened here would have constituted such a recommendation within the meaning of the kickback statute is not something that district court decided and is not something that we've taken a position on. But, again, even if you assume that the charities did make a recommendation for particular items and services within the meaning of the kickback statute, the relator would still need to show that the claims that they submitted to the federal government were for those items and services. Meaning relating to those patients. Patients, exactly. So they have to show that the patients received that recommendation and that that's what they're submitting claims to the federal government for. That did not happen here. There's no evidence that that happened. Well, Your Honor, we haven't taken a position on the particular facts of this case. I just want to really zero in on what the district court did here that we think was incorrect. The district court added a subjective causation requirement to the False Claims Act requirement of falsity. You know, might that not have been a little bit of loose language? Excuse me? Sorry. Might that not have been a little bit of loose language in connection with what the judge did here? He said the quotes, this is on page 15 of your brief, stated that the relator failed to show that the 24 patients from a credo billed chose a credo because of the donations. And then he does say it's too attenuated a causal connection. Well, doesn't it have to be at least one that somehow at least got the message? We think that someone did have to get the message, but it doesn't matter whether they chose a credo because of the referral. It's just like in the classic context where a doctor refers patients to a particular hospital. The government doesn't need to show that those patients chose the hospital because they received the referral from the doctor. What the government is purchasing when it pays for medical care of federal beneficiaries is conflict-free medical care. And so once a doctor has received a kickback, the referrals or the recommendations that the doctor then makes are tainted by that kickback. And the kickback statute assumes that those sorts of payments inherently corrupt medical judgments. And so the whole point of the kickback statute is that the government doesn't need to prove that the money actually influenced the doctor or that the doctor's referral actually influenced the patient. And that's the kind of subjective intent that we think the district court's opinion could be read to be requiring at JA-16 and JA-21-22. By the way, the kickback statute really covers what we had here technically wasn't a kickback, was it? It was monies paid out for the purpose of getting a referral, whereas technically wouldn't a kickback be, okay, you get the referral, you get paid, and you kick back part of it? Sorry, I was just using the term kickback to refer generally to the payments made within the meaning of the anti-kickback statute, but not a particular type of payment in particular. So you gave a couple of examples of what would not be covered if you had, you could have an anti-kickback statute violation but not a false claims act, and one was you'd have one doctor involved but the reimbursement was submitted by another doctor. That's correct. Then another one you gave was if you have a kickback involved to get a particular medical instrument, let's say for an orthopedic surgery, and that's not used by the doctor but it's ultimately used by the hospital, you say that travels through to the item? So in Hutchison, the 11th Circuit held that the taint from the original kickback violation sticks with the items or services that were the subject of the kickback scheme, and so then it doesn't matter who later submits the claim to the federal government because the taint sticks with that item or service throughout. What else would not be covered? If you have an anti-kickback statute violation but you would not have a false claims violation, you gave one example, what would be another example that would not be covered? There can be a violation of the anti-kickback statute without any referral at all or any claim ever submitted to the federal government, and we clearly think that there has to be actually a false claim submitted to the federal government. The question really is whether the claim is false, and I think it's helpful to get back to this Court's reasoning in Wilkins where the Court explained that when you're submitting claims for items and services that were the subject of a kickback violation, your certification that what you're billing for complied with the kickback statute is no longer true, and so that's all that's required, and what we think the district court could be read to have done here is add an additional requirement. So you say that because the actual referral or whatnot is the subject of the anti-kickback? The kickback statute criminalizes to pay money to induce someone to refer patients for particular items or services, and so then when someone later submits a bill to the federal government for those items and services for the patients that were referred by that doctor, then it's no longer true that those items and services complied with the kickback statute, and so the claim is false. You still have to have some, under your theory, there has to be some proof that the patient for whom the bill was submitted received a recommendation, or was the patient who was referred by the doctor in the doctor example? We don't have the doctor here. We have the doctor's friend, so we don't know. That's the problem I have with this. There's layers here. It's not as simple as Dr. A. Exactly, Judge Conte, and I think a lot of the conceptual difficulty that I know I've had and others have had with this case just comes from the fact that the district court assumed the kickback violation without really spelling out what the scope of it was, and so without knowing what the basis exactly for the kickback violation is, it's hard to tell whether the claims that were submitted to the federal government were for the same items and services that were the subject of that alleged kickback scheme. But if there's no evidence in the record that the patients for whom federal claims were submitted were even exposed to the preferred provider list put out by HE&J, under the standard that the government would have a supply on causation, there would be no federal claims act violation, right? But just to clarify, we don't think it's a causal relationship. We just think that it's a link that's required. Sorry, I don't mean to nitpick, but just that's our most important point. I understand. I understand. That's why you're here. It's not but for it's a different kind of linkage, whether we call that the nature of the causal connection or not, but the point is that there's no need for us to address the question or even remand for findings as to the AKS violation itself if there's not evidence in the record that the patients for whom the federal claims were submitted were even exposed to the referral or recommendation list. That's true. If you make that factual finding that the broadest of the theories under the kickback statute that there is no evidence linking those kickback violations to the 24 particular patients, then you wouldn't need to remand. But, again, we're not here to take a position on whether that evidence exists in the record. We just want to make clear that there's no additional requirement that there were later proved that the charities made the referrals or recommendations or whatever theory is being used, that they made those because of the kickbacks or subjectively, or that there also doesn't have to be evidence that the particular 24 patients chose a credo because of the recommendation or referral that they allegedly received. But even under the government's approach, putting aside but for in this more attenuated approach, the government agrees that if the patients in question were not exposed to the referral or recommendation, as the case may be, that there would be no Federal Claims Act investigation because the federal claim was not the result of the AKS violation. That's correct. And I think an analogous situation would be if a company was paying kickbacks to one doctor to make referrals and then the company submitted claims for patients that didn't receive those referrals. There wouldn't be a False Claims Act violation there even though there is a kickback statute violation. Great. Finish up now. Well, so if that's the case, then stepping back, can you help us from the government's perspective, it's not but for a cause, how would the government propose articulating what that connection then is? Well, I think the easiest way I think to think about it is in a case where the items are services that are being claimed for reimbursement, where those particular items and services are the same ones that were the subject of the kickback scheme, then the certification that the claim complies with the kickback statute is false. That's easy. I think so. That's the easy case. But I mean, you use connection or subject of and Judge Grouse said it resulted from, you agree with that. So there's some type of causation but it's not, you say not causal causation. Sorry. We're trying to draw a very fine nuanced distinction here and that's what we're searching for. Well, I think just to be clear, I wasn't meaning to, if I misspoke, I was not meaning to endorse any sort of causal connection at all. What the district court appeared to do here was impose a subjective causation requirement and we think that that is clearly wrong and if you look at the class kickback scenario, it's easy to see why and that's because the whole purpose of the kickback statute was so that the government wouldn't have to prove that when a doctor received money, it influenced his medical decision making. The legislative history shows that it was enacted in order to avoid that sort of proof. And this was the 2010 amendment? No, no, no. This is the original kickback statute. And so we think that because of that, the question you're looking at is whether what's being claimed for reimbursement from the federal government, whether that sort of transaction or whatever complied with the kickback statute. And so to answer that, you look at the kickback statute and it doesn't require proof that the doctor, for example, made the referrals because he received money from the company. And to the extent the district court required that here, we think that that was in error. You want to qualify or clarify perhaps that that's not what the district court was holding or whatever standard we espouse is not that standard if we reach that question. But you also, from your own qualifying language, both in the brief and argument, I gather acknowledge that the district court's opinion could be read to be using a standard that's a linkage standard, a connection. That is that there's the district court talked about they're not the evidence of cause, but then said of any evidence. For 8 and 1, the 24. Again, we're not here to take a position on the particular facts of this case. But you're saying you don't have a dog in the fight other than with respect to having courts find false claims act violations under the way that you understand it should happen when there's an anti-kickback statute violation. That's correct. And particularly when there is a kickback violation, which would involve items or services, and then you submit a claim for those same items or services for those same patients, the claim is false. And it doesn't matter whether the money that exchanged hands actually influenced the subjective medical decisions that happened along the way. And that's our bottom line point. And I'm sorry if it's been a little confusing to get out. So that's to say, in other words, that the subject of the false claims act violation would need, from the government's perspective, to also be the subject of the anti-kickback statute violation. And on the anti-kickback side, the case law has already established that taint is sufficient for someone to become a subject of the anti-kickback violation. That's almost exactly how I would phrase it, except I think I would switch it. When it is the subject of the kickback violation, it is a false claim. The express certification also says that if the underlying transaction wasn't in compliance with the kickback statute, the claim would be false. And so in a situation where we're talking about the underlying transaction rather than the particular items or services that are being claimed, that might raise additional issues. But clearly, when what is being claimed for reimbursement is the subject of the kickback violation, then the claim is false. And that's the only question here, because of the posture of the case, is whether these claims are false. And so it seems like what the district court was doing was, since it didn't define the scope of the kickback violation, it was searching for some sort of narrowing principle and added this new requirement to falsity, when really the only question is whether the claims or the underlying transaction complied with the kickback statute. So going back to Judge Conti's question, if no one of the 24 people, if there's no evidence that any one of them solved the recommendation, there's no connection, to use your words. That's correct, and I think as we said at pages 14 to 15 of our brief, that the relator would need to show that patients referred by the charities or to whom the charities recommend O2Credo services are the same patients for whom O2Credo then billed the federal government. Okay. If there are no further questions, thank you. Thank you. Judge Singer. Maureen, may it please the Court, Craig Singer representing O2Credo. I'd like to try to cover three points today. First, the evidence in this case did not show any connection under any standard between O2Credo's contributions to HandJay and the actual claims for federal funds, and so the district court's judgment should be affirmed under any standard. Can we just stop there? Because as I understand the argument from your opponent, they did present evidence, but it wasn't direct evidence, it was circumstantial evidence, and we always say circumstantial evidence is the same as direct evidence. So do you disagree with that, that you can't base it solely on circumstantial evidence? Well, I disagree that there is any circumstantial evidence in this case that relates to any of the 24 federal patients. I do agree with your Honor that if there were circumstantial evidence that would be sufficient to prove to a jury that one of the 24 patients actually was referred or illegally recommended as a result of an anti-kickback violation and that claim was submitted by O2Credo with regard to products or services provided to that federal patient, then circumstantial evidence can be as good as direct evidence. But there is no such evidence here. There's no evidence of any kind that ties O2Credo's contribution to any of the patients. To get out just my second and third points that I hope I can get to them, O2Credo's contribution did not violate the anti-kickback statute in the first place. He's assuming that. The judge has assumed that. This court can affirm. That's a given. He just assumed for the purposes of a false claim back that there was a kickback statute violation. Got it. The district court assumed that. What I'm saying is that this court can affirm on the basis of any proper basis that's in the record. And if the court finds that there is, as a matter of law, no anti-kickback violation, then the court can affirm for that reason as well. And we made that argument in our brief. It was not responded to. The third point is that even if there had been some violation of the anti-kickback statute, it was, at best, a debatable one. And debatable violations do not support CFJ as a matter of law. Time out. If there was a violation of the anti-kickback statute, there was a violation of the anti-kickback statute whether it was debatable or not. So then the question becomes, when can it become a false claims act? We went through with Ms. Allen various scenarios, and we're trying to establish what would that, quote, connection, close quote, be without necessarily being a but-for causation. And I'll turn to that right now. But just to clarify, my point is you also need to show scienter. And if it's a debatable violation, there's no scienter as a matter of law. Under either the false claims act or the anti-kickback statute. To get an anti-kickback statute violation, don't you have to have scienter as a criminal statute, right? Yes. Okay. And what the court here was, I think, studying with your second point, the court assumed that there was a violation. Correct. He didn't say that there was necessarily one. Correct. Absolutely not. And you'd like us to affirm on the false claims act ground and not reach the AKS ground. I'd welcome for you to affirm on all three grounds. But, yes, you don't need to reach the AKS ground if you affirm on the false claims ground. So why don't I turn to that now. I just want to note that we have made the anti-kickback argument as well, and the court is free to address that as a basis for affirmance. Do you disagree that the government has argued for something less than a but-for causation test? You've made the point in your brief that you think under any test, there's not evidence in the record that would support the claim here. But why would we adopt a but-for standard when every other court that's addressed this so far seems to conform with a lesser connection standard, something that's less than a traditional but-for causation? Well, there's very little law out there on what the actual standard is. But there is legislative history. So starting with the statute, I think, Your Honor, is speaking to the 2010 amendment, which does use the term resulting from. And resulting from, as the Supreme Court held recently in the Burge case, relating to a different statute, means but-for causation. And the language that the Supreme Court used is quite strong on that. It's a fundamental – I'll read it. It's one of the traditional background principles against which Congress legislates, that a phrase such as results from imposes a requirement of but-for causation. Now, Your Honor is correct that there's some legislative history that those senators who introduced the predecessor bill to the 2010 act were aiming to try to make sure that some third party who causes the doctor to submit the claim is also liable. And we don't dispute that. But that doesn't change the ordinary meaning of the term resulting from, which a lot more than two members of Congress passed. And there's nothing in the statute that indicates that it means anything other than the traditional but-for causal meaning of results from. And there's nothing about the statute that suggests it should be read contrary to the common law, which the Escobar case most recently has said the False Claims Act should be read in light of, the false or fraudulent language. And causation, including but-for causation, is a fundamental aspect of common law fraud. You seem to be asking us to step back and think about causation, but-for really in the context of the AKS violation. Don't we have resulting from and, in a sense, even the but-for causation for a False Claims Act violation when the certification says this claim complies with federal law, including the anti-kickback statute, and you have separately independently established that the claim, the subject of that claim, the transaction underlying it, in fact, violate the anti-kickback statute. And once that's established, then isn't there sufficient causation for the False Claims Act that the claim is, in fact, false? And on materiality, the government is paying it because it's been represented to be in compliance with the law. That's an awfully broad stroke, Your Honor. And I think a couple of answers on the provider agreement. The provider agreement says that, which is signed far in advance of the actual claim being submitted, it says that we understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with all laws, and it calls out the anti-kickback statute as one of those laws. Now, there's no reason to read that to mean anything different than causation. It doesn't say what it means for the claim and the transaction to comply with the law, and I think some of the questioning earlier suggested correctly that you need to look at the facts and circumstances of the particular AKS violation to determine, in a difficult case, to determine whether that causal link is there, whether a jury could find the causal link is there. But I think it's also important to remember that in Escobar, the court made clear that the government cannot make the False Claims Act apply to every statutory or regulatory violation just by saying that that violation is a condition of payment or a condition of participation. The court was quite clear on that. You have to look at the particular claim and whether, in fact, that claim, under those circumstances, was misrepresented in the first instance and whether it was material. Now, we don't need to get to the misrepresentation aspect in this case because the AKS, as amended in 2010, makes that automatic if you have a claim that results from the AKS violation. You still need to look at materiality, and I really don't think it's enough just to say that you signed it four or three years ago, therefore everything is material. If we adopt your reading of resulting from to be but for causation, the government says in response to that on page 22 of its amicus brief that that's absurd because it would lead to the odd result that a defendant could be convicted of criminal conduct under the AKS for paying kickbacks to induce medical referrals but would be insulated from civil FCA liability for the exact same conduct absent some additional proof that each medical decision was, in fact, corrupted by the kickbacks. There's nothing odd about that at all, Your Honor, because these are two different statutes. The anti-kickback statute is a crime that can be enforced by the Department of Justice criminally. It can be enforced administratively directly by the government as a civil matter. You can debar someone. You can get penalties. And I think that the government's attorney today recognized that a violation of the AKS is not automatically a violation of the False Claims Act. The False Claims Act depends on the claim. What does the claim say? Is the claim false or fraudulent? And it is quite ordinary to have an anti-kickback violation that does not result in a false claim which could be punished under the anti-kickback statute but not under the False Claims Act. So we need to look at the False Claims Act in particular. And so let's turn to what the evidence in this case is because while I do think that the but-for causation is the right test, and I also think, let me say one more thing on that, that Judge Krause's question to my adversary over today is a good example of why you need a strong causation test because it could be that the patient's choice of a provider had absolutely nothing to do with the kickback. But the burden that you would pose in this situation would be you have to show that the patient himself or herself acted on that referral. You know, if you go to Dr. A and Dr. A says, I think you should have your test done at Hospital B, and Hospital B was paying the doctor to get that referral. And if the test is, was the referral made and did the person go to the hospital, your test would be not only did the person go to the hospital, but that was the reason the person went as opposed to, that's the local hospital and that's why I went. I think in your example, Judge Conte, the jury would have sufficient evidence in front of it to find the causation. If there's other evidence in the record that would disprove that, then we think that would still be relevant. So, for example, many patients are required by their insurance to choose a particular home care provider. And so take a patient who theoretically received an illegal recommendation, whatever that means in this case, and says, okay, a credo has been recommended. I already use a credo. I've been a credo customer for years. And, by the way, I don't have a choice, because my insurance company requires me to use a credo as my home care provider. The mere fact that that patient saw the illegal recommendation, according to the government's theory, as I understand it, would be sufficient to show causation. I don't think that that's a claim. If a claim is submitted for that patient, I don't think that claim would have anything to do with the anti-kickback violation. But let's talk, because I'm running out of time, about the evidence in this case. There is no evidence that Hanjay itself referred patients to a credo. And, in fact, it's undisputed that they didn't. Hanjay's mission was all about patient choice. Putting aside whether it's a referral or recommendation, from your perspective, is there any evidence in the record that the 24 patients for whom federal claims were submitted that are at issue in this case were even members of HANJ? That's not in the record. I don't believe, by the way, that Ms. Bostic testified that every single hemophilia patient in New Jersey was a member. If that's the case, I missed it. But she certainly did testify that HANJ has a large membership and that there are a certain number of hemophilia patients in New Jersey. But I don't think that that proves it. But I also don't think that matters. What evidence is there in the record that HANJ, even assuming that they're members, that HANJ actually sent out letters or e-mails that included the preferred provider list to its membership? To my knowledge, there's zero evidence of that. There's zero evidence that any HANJ, that any federal patient, whether they're a HANJ member or not a HANJ member, ever looked at the website or the portion of the website that contained the supposed recommendations. There's simply no evidence that any hemophilia treatment center at HTC ever referred a federal patient to a credo, let alone because of a contribution that a credo may have made to HANJ. There's just nothing in the record that Relator has pointed to that connects a federal patient to the contributions. And so it doesn't matter what standard you ultimately apply. I hope that the Court won't take this opportunity to apply a looser standard of causation just because of the lack of evidence in this case. And I think this case may be a bad example on which to decide ultimately what the standard of causation ought to be in anti-kickback slash false claims act cases because there is no evidence. If not this case, what case is the right one? Perhaps a case that actually would require the Court to decide between the standard of causation right, which, by the way, I don't see anywhere in the text of anything that the government is articulating, and the standard of but-for causation that appears in the 2010 amendment, which we're advocating. The evidence in this case doesn't require the Court to draw that line. Sometimes we'll say, is the issue teed up? The issue appears to be teed up here pretty well. Well, I'm not saying the Court lacks jurisdiction, but I am saying that the issue is not teed up in the sense that it requires you to decide between the one standard and the other because under either standard or any standard, the evidence does not support a finding here. What you're in effect saying is why don't you affirm Judge Hillman for exactly the reasons that Judge Hillman gave? That would be an excellent reason. Incidentally, the difference in the standard has been waived anyway because the relator didn't even raise it until the reply brief in this Court. It was never urged to the District Court below, and so whether the District Court made a conscious decision to use the language that it used or not. But we also have the inherent authority to, even if it were waived, to deal with it, do we not? It's a prudential doctrine, and we have the authority to do it, but typically when issues are not presented in the District Court and the District Court decides issues based on the arguments before him, this Court does not then reach additional issues that were not presented, and there's good reason for that, and I think that the District Court really did not have the need or the opportunity to parse the standard of causations between what the government is now advocating, which it didn't advocate below, and what we're advocating because there was no evidence. There's no evidence under any standard, and the argument was not made by the relator below. Well, there's some disagreement, in fact, the characterization of the standard the District Court used between the parties, but you're suggesting that we could conclude, regardless of the standard, which we believe would not need to reach, that given the evidence in this record that there couldn't be a claim, that summary judgment was appropriate. Correct, Ron. I think you can easily affirm without deciding exactly what the standard is, as long as the standard is some linkage is required. The omissions that we've been talking about in terms of evidence in the record connecting these particular patients to the alleged AKS scheme, they seem like fairly basic discovery requests,  Your learned colleague has suggested that there was some, whether from the timing or from refusal to comply with discovery requests, that they weren't able to get that discovery. Can you shed some light on what happened in terms of the requests being issued or refusal to produce them? I actually can't shed light on the details because this is the first I've heard of this argument. It was not raised in the briefs. It was not raised on summary judgment. The relator, as far as I know, has never argued that we can't make the showing because we need more discovery. The Quinn case, a similar argument was made, and this court recognized that had the relator wished to take additional discovery, the relator could have asked to reopen discovery, to take more discovery. No such request was made here. There was no motion to compel discovery that was denied. So I think that's simply a Hail Mary. Thank you very much. Ms. Poserena. Thank you, Your Honor. I would like to reply to some arguments that were made by the government and by Mr. Singer. First of all, there's significant circumstantial evidence, and one of the things that we're losing sight of a little bit here is that this was a decision on a motion for summary judgment. And the standard on a motion for summary judgment is that if there is a genuine issue of material fact, that summary judgment should not be granted. But the court is saying here that you've got to put some evidence in rather than, as Quinn said, you can't extrapolate. You need to have something for at least one of the 24, do you not, that they saw the recommendation? Well, Your Honor, that's where we disagree with the government in this. Well, first of all, we do have evidence. We have circumstantial evidence that the 24 were exposed to this. What is the circumstantial evidence? The circumstantial evidence is that the testimony of multiple Acredo employees that this information was getting to the HTCs and therefore getting to the patients, that a patient representative, Martha Oshagroso, testified that the Hanji website gets all of the patients to know that we're part of Hanji, so use us. What evidence is there that these patients looked at the website? According to Ms. Oshagroso, the patients look at the website and that gets the information to them. According to Vice President Diane. But what patients look at the website? Even if it was reasonable to think that HANJ members did, how can it be that in the course of discovery there wasn't even evidence of membership of these 24 patients? Your Honor, that had to do with the fact, and I understand Mr. Singer wasn't involved in that aspect of it, that the names of the 24 patients were only released to us when we received the billing information, which was, and I see my time is up, which was at the end of discovery. However, we did deduce information that these patients, that all of the Hanji patients received regular communications from Hanji, that substantially every hemophiliac in New Jersey or their family members were members of Hanji, so that every hemophiliac in New Jersey received this information. I'm sorry, is that only by way of what's posted on the website? Or is there in the record a letter or email that lists the preferred providers? There's several ways that that was received. The first was that every year Hanji sent out a letter to its members and the HTCs with a list of the approved providers. Where is that in the record? I don't have it exactly in front of me, but I can get that to you. That's absolutely in the record. Second, there is an annual meeting, and at that annual meeting, which is attended by the members of Hanji, Alena Bostic gets up and talks about the approved providers. These are our approved providers. We want you to work with our approved providers because they repeatedly assist you. Were any of the 24 at this meeting? We don't have that evidence, Your Honor. But what I would say is, under the government standard, we don't need evidence as to whether those 24 were at the meeting. In the government's brief— But you need some connection between the kickback statute violation and the False Claims Act. We do. And that's what we talked about at length probably for a good 15, 20 minutes with Ms. Allen. Yes, Your Honor. And our connection is the Wilkins standard. You asked me repeatedly during my oral argument about Quinn, but what I would say to you is that if we apply Quinn to this case, we eviscerate Wilkins. And Wilkins' standard is that you were paying kickbacks in this case for recommendations, a further issue where the district court focusing on referrals. This is the fact that the AKS also applies to recommendations. Wilkins suggests that's enough at a motion-to-dismiss stage, and it expressly says that it is not enough at a summary judgment stage. I'm sorry, Your Honor. Could you repeat that question? I mean, Wilkins, it's not enough at the summary judgment stage, even if those kinds of inferences could be drawn at the motion-to-dismiss stage. We're at a different stage of litigation here. I agree with that, Your Honor, but Wilkins specifically states— sorry, I'm going to turn back here— that court is looking for a knowing violation of the AKS while submitting claims for payment. And so the question is, as the government explained in their brief, that if a doctor receives money to make a recommendation, that's a violation of the AKS. And we're not going to then go to the patient and ask them why they chose the particular hospital that they chose to go to lab work for. But don't you have to show that the patient was a patient of that doctor and not some other doctor? So wouldn't you, at a minimum, have to show that the hemophiliac was a member of Hancock? Yes, Your Honor. We don't have direct evidence of that. We have circumstantial evidence of that. And from our position, that creates a disputed fact that, first of all, the district court never reached that fact. But there are so many circumstantial facts from which a conclusion can be drawn that every hemophiliac in New Jersey— To get at summary judgment a disputed issue of material fact, you have to put in some evidence that makes the material fact disputed. And what you're saying today doesn't get us there. That's what Judge Hillman said as well. I don't know that Judge Hillman reached that because he was looking for a causal connection. What I'm saying is that we have multiple pieces of evidence, probably ten pieces of evidence, all circumstantial, that show the testimony of the Acredo employees, the testimony of the Han J members, the documents that the Han J executive director sent both to Han J members and to the HTCs, the emails from Ms. Bostic, the fact that the grants to HTCs were 42 percent of their operating budget. The HTCs knew that their money was coming from Acredo. Amy McBeth, one of the executives at Han J, sang in a document, if we decrease our funding to Han J, we decrease our total number of patients. But all of that goes to the AKS violation. That may be enough to establish that there's an AKS violation predicated on referrals or recommendations to some patients. But what we keep coming back to is what evidence in the record is there that there was as to these 24 patients. The evidence is that Acredo talks about to all the Han J patients, not just particular patients, not just private insurance patients, every Han J patient in New Jersey of which those 24 were more likely than not members. More likely than not, that's the Quinn problem. But for civil false claims, that case, we only need to prove this by a preponderance of the evidence. We need more than speculation, even 60 percent. Quinn wasn't enough. I understand that, but I think from the facts. But still, it's quite a leap to say we're going to generalize from that, to say, well, that takes care of the rest of the 20 percent. They must have been included. It seems like the kind of information that could have been obtained from the basic discovery request. We would disagree with that, Your Honor, but our position is that we have a lot of circumstantial evidence. I mean, I could read through every single piece of it for you, but we have a lot of circumstantial evidence from which the court should have concluded that there was dispute on the facts, and therefore, this case is not right for summary judgment.  Thank you very much. Thank you, Your Honor. And I would ask if the transcript would be prepared or so argument that it be split three ways, government, your side, and that side. Thank you very much.